IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 14, 2013 Session

## CALVIN EUGENE BRYANT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1478     Steve R. Dozier, Judge**

---

**No. M2012-01560-CCA-R3-PC - Filed August 16, 2013**

---

The Petitioner, Calvin Eugene Bryant, appeals the Davidson County Criminal Court's denial of post-conviction relief. The Petitioner argues on appeal that trial counsel provided ineffective assistance of counsel by failing to request a jury instruction on the lesser included offense of facilitation. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

James O. Martin, III, for the Defendant-Appellant, Calvin Eugene Bryant.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Rachel M. Sobrero, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

A Davidson County Grand Jury indicted the Petitioner for three counts of sale of a Schedule I controlled substance within a Drug-Free School Zone (counts 1, 2, and 4) and two counts of delivery of a Schedule I controlled substance within a Drug-Free School Zone (counts 3 and 5). See T.C.A. §§ 39-17-417(a), -432 . At trial, the jury acquitted him of the first count of sale of a Schedule I controlled substance within a school zone and convicted him as charged on the remaining counts. The trial court merged the delivery counts with the sale counts and imposed concurrent sentences of seventeen years for each conviction. On appeal, this court upheld the Petitioner's conviction and sentence. State v. Calvin Eugene Bryant, Jr., No. M2009-01718-CCA-R3-CD, 2010 WL 4324287, at *1 (Tenn. Crim. App. Nov. 1, 2010), perm. app. denied (Tenn. Apr. 13, 2011). On December 28, 2011, the

Petitioner filed a timely petition for post-conviction relief. Following an evidentiary hearing, the court denied post-conviction relief, and the Petitioner filed a timely notice of appeal.

**Trial.** On direct appeal, this court summarized the evidence presented at trial:

This case arises out of three controlled drug buys that took place on March 4, March 21, and April 23, 2008, between a confidential informant and the defendant. The defendant was indicted on three counts of sale of a Schedule I controlled substance (Counts 1, 2, and 4) and two counts of the alternate theory of delivery of a Schedule I controlled substance (Counts 3 and 5). Each of the five counts was alleged to have occurred within 1000 feet of a school in violation of Tennessee Code Annotated section 39-17-432, the "Drug-Free School Zone Act." The defendant was originally tried in October 2008, but the jury was unable to reach a verdict. The trial court declared a mistrial, and the case was transferred to a different trial court division. The retrial was scheduled for December 2008, and after a continuance, the case went to trial in February 2009.

**State's Proof**

At trial, Detective William Loucks testified that he was a detective with the Specialized Investigations Division of the Metropolitan Nashville Police Department in the Gang Unit. He explained that the Specialized Investigations Division conducts "longer term" and "more indepth" investigations, often involving federal law enforcement agencies. In early 2008, Detective Loucks became involved in an investigation of the defendant in an area where "a high distribution of narcotics" had been taking place. Detective Loucks planned to use confidential informants to make purchases, and he described how he developed the informants.

Detective Loucks testified that in February 2008, he arrested Terrance Knowles on an habitual motor vehicle offender charge, and in the process, he talked to Knowles who "gave [him] some information that [he] felt was pretty accurate[.]" Detective Loucks gave Knowles his card and contact information and told him to contact him "if [he was] interested in working when [he] g[o]t out[.]" Knowles later contacted Detective Loucks, who met with him and another detective, and they discussed the rules and regulations for working as a confidential informant.

Detective Loucks testified that his next contact with Knowles was on March 4, 2008, when Knowles was to do a "reliability buy" of twenty pills for $140–an amount he could purchase "that wouldn't throw up any flags." Around 11:00 a.m. that day, Detective Loucks met with Knowles at an address in the Edgehill community of Nashville and gave him $140 in previously photocopied money. Detective Loucks and other detectives followed and monitored Knowles as he went to a location in a housing complex in Edgehill. Detective Loucks was not able to visually watch Knowles enter and exit the house, but he was able to monitor the transaction via the audio device with which Knowles had been wired. Detective Loucks identified a tape recording of the March 4 transaction and stated that he had since listened to it and recognized his voice as well as Knowles' and the defendant's.

Detective Loucks testified that after the transaction, he recovered the pills from Knowles and searched him. He turned the pills into the property room and submitted a request for forensic analysis by the Tennessee Bureau of Investigation ("TBI"). Detective Loucks identified "a bag of various colored pills" as the ones purchased by Knowles on March 4. He noted that Knowles was paid forty dollars, the standard rate for a reliability buy, and fifty dollars for providing intelligence on a suspected drug dealer.

Detective Loucks testified that the next transaction took place on March 21, 2008. This transaction was to be for 100 Ecstasy pills for $650. The transaction took place "[i]n the vicinity of 1305 12th Avenue South, Edgehill complex." He elaborated that it was "in the vicinity" because the defendant was not inside his residence but was standing outside. Detective Loucks described the same procedure as with the first transaction, whereby he met with Knowles, searched him and his vehicle, gave him previously photocopied money, and followed him to the intersection of 12th Avenue and Edgehill. As with the first transaction, Detective Loucks monitored and recorded the transaction on audio, while other detectives maintained visual surveillance.

Detective Loucks testified that he had since listened to the recording of the second transaction and on it recognized his voice as well as Knowles' and the defendant's. After the transaction, Detective Loucks recovered a bag of pills from Knowles, which he kept until the end of his shift when he field-tested the pills and turned them in to the property room with an analysis request form. Knowles was paid $100, the standard rate being a dollar per pill. Detective Loucks identified "a bag of various colored pills" as the ones purchased by Knowles on March 21.

Detective Loucks testified that a third transaction took place on April 23, 2008, around 10:00 p.m. Knowles told Detective Loucks that he had contacted the defendant and could purchase 200 pills for $1200. After going through the same procedures as before, Detective Loucks was able to personally observe this transaction through a pair of binoculars from a distance of 200 to 250 yards as well as listen to the audio. Detective Loucks testified that he had since listened to the recording of the third transaction and on it recognized his voice as well as Knowles' and the defendant's. After the transaction, Detective Loucks recovered "two bags of various colored pills" from Knowles and paid Knowles $200 at the standard rate of one dollar per pill. Detective Loucks transported the pills back to his office, where he conducted a field test and then turned them in to the property room along with an analysis request form.

Detective Loucks testified that in addition to the money paid for each of the drug buys, Knowles was paid an additional amount of $680 after the defendant was indicted and for items recovered pursuant to a search warrant. He was paid $100 for each of the defendant's five felony indictments, $100 for a gun recovered at the location of the defendant's arrest, and $80 for two controlled substances that were recovered. These were the standard rates for payment to informants.

Detective Loucks testified that he spoke with the district attorney about Knowles' habitual motor vehicle offender charge and "[i]t was dismissed upon [his] request," which was "[n]ot unusual." He also contacted Knowles' probation officer in July concerning a violation because he was trying to keep Knowles out of jail "to further along the investigation." He did not make any other promises to Knowles or give him any other assistance than what he had described. He said that "[n]othing is promised at all to the cooperating individuals, except . . . that I'm responsible for their safety." Detective Loucks stated that after Knowles' identity as the confidential informant was revealed at a previous hearing, he made one additional payment to Knowles on November 6 because "[h]e had stated . . . that he didn't feel safe in the current environment, so I paid him eight hundred dollars, again out of our intelligence fund, for relocation expenses."

Detective Loucks said that he did not arrest the defendant immediately after any of the three sales because they "were trying to broaden the investigation . . . [and] provide more bang for the buck for the taxpaying citizens." After the defendant was arrested, Detective Loucks asked him

-4-

"about him selling pills" and the defendant said that "he sold anywhere between thirty to forty pills" in a week. The defendant did not respond when Detective Loucks asked him where he was getting the pills.

On cross-examination, Detective Loucks acknowledged that he did not record any of the conversations between Knowles and the defendant about setting up the transactions. He stated that the confidential informant contract states that "they are not to induce any individuals who are not predisposed to committing a crime." Detective Loucks acknowledged that the audiotape of the first transaction reflected that Knowles made several phone calls and no one answered. With regard to the second transaction, Detective Loucks agreed that the Ecstasy pills were delivered by a third individual, and Special Agent Mark Shafer observed the transaction, but he was not in a position to see it. Detective Loucks said that Knowles returned from the exchange with ten dollars more than he had been expecting.

Detective Loucks testified that the controlled substances that were recovered when the defendant was arrested did not come from the defendant's home but were found on the awning of the porch across from the defendant's home. Someone other than the defendant was seen throwing the package of substances onto the awning and running away. With regard to his conversation with the defendant regarding how many pills he sold a week, Detective Loucks acknowledged that he did not record the statement or have the defendant submit anything in writing.

Detective Loucks testified that sometime after the first trial in this case, he appeared at Knowles' probation violation hearing, and Knowles was released "a period of time later" and given money to relocate. Knowles was apprised of the next court date, but Detective Loucks did not issue a subpoena because "[he] d[id] not have the power to issue a subpoena outside of an officer involved in an investigation." On continued cross-examination and redirect examination, Detective Loucks further testified about his knowledge of Knowles' whereabouts and his efforts to find him prior to trial. Detective Loucks stated that the defendant was "the leader of a set of Gangster Disciple gang members," and Knowles was "in fear for his life . . . because he received threats while he was incarcerated."

Terrance Knowles FN1 testified that he was presently in custody on a probation violation. He went to court on the violation in August 2008 but left court after he was approached by defense counsel, who wanted to speak to him

about the defendant's pending case. He was on a one-year probation term for the felony offense of "habitual driving offender." Knowles said that he went to jail and was charged with the driving offense in February 2008, at which time he had a discussion with Detective Loucks about "helping each other out, something like that. He told me what he was trying to do, what he was looking for. And I said I can do that." Detective Loucks told him that he was working on "[c]leaning up the Edgehill area," and the defendant's name came up during the conversation. Knowles knew the defendant by the nickname "Fridge." Knowles agreed to work with Detective Loucks and did so three times related to the defendant.

> FN1. The testimony of Terrance Knowles from the first trial in this matter was read into the record by another witness as Knowles was not present and had been declared unavailable by the trial court pursuant to Rule 804 of the Tennessee Rules of Evidence.

Knowles testified that the first time, he called the defendant "the day before" and told him that he wanted to buy twenty pills. The defendant gave him the price of $140 and said to call him the next morning. Knowles knew the defendant prior to this time, already had his phone number, and recognized his voice when he called him. The next day, Knowles met with the detectives, who "put a wire on [him]," and gave him instructions on making the transaction. Knowles went to the defendant's residence in Edgehill and attempted to reach him by knocking on the door and calling him, but he received no answer. While he was outside the residence, the defendant's sister arrived, and she discovered that the defendant was asleep.

Knowles testified that the defendant's sister let him inside the house, and he woke the defendant and told him that he needed the pills. The defendant asked him how many pills he wanted and retrieved them from one of the closets. There was no one else in the bedroom at the time. Knowles and the defendant then went downstairs, and the defendant asked Knowles if he had a bag. After Knowles responded that he did not, the defendant gave Knowles a sandwich bag and put the pills in it. Knowles paid the defendant $140 for the pills and asked him the price for 100 pills for the next time. The defendant told him that it would be "[p]robably six fifty or something like that." Knowles left and met with the detectives, turning over the pills. Knowles was paid "[a] hundred dollars, something like that."

Knowles described the second time he met with the defendant while working as a confidential informant. He called the defendant "and told him [he] needed a hundred pills this time." Knowles and the defendant agreed on a time for him to come by the defendant's house. Prior to going to the defendant's house, Knowles met with the detectives to have a wire put on him. When he arrived at the defendant's house, he had to wait twenty-five to thirty minutes "for the pills to get there." A white Expedition arrived, Knowles gave the defendant his money, and the defendant walked to the passenger side of the vehicle and returned with 100 pills. Knowles received some change back from the deal. Knowles then left and met with the detectives, turning over the pills. He was paid $100 to $150 for this transaction.

Knowles testified that the day of the third transaction, he called the defendant and "told him I wanted to get two hundred this time." The defendant told him that he was "going to work on it" and that it would cost $1200. Knowles called the defendant back, and the defendant told him "the dude was on his way. And, . . . I told him that I would be out there in a little bit." Knowles called the detective to "let him know he was on his way."

After meeting with the detectives, following the same procedure, Knowles went to meet the defendant by a basketball court near the defendant's house in Edgehill. Knowles waited "about an hour" until a Jeep Cherokee arrived, and the defendant said, "[T]hey're right here." Knowles counted the money and handed it to the defendant, who went and got the pills from the person in the vehicle. The defendant returned with two bags of different colored pills, which he gave to Knowles. After he received the pills, Knowles met with the detectives and turned over the pills.

Knowles testified that Detective Loucks helped him have a driving charge dismissed in March 2008. In addition to the money he received for each transaction, Knowles also received $700 after the defendant was arrested. He did not receive any other money or benefit, nor was he promised anything in exchange for his testimony. Knowles said that he did not want to testify, and he was telling the truth about what happened on those three occasions.

On cross-examination, Knowles acknowledged that he discussed his testimony with the district attorney and Detective Loucks before the trial. He agreed that his felony habitual motor vehicle offender charge had been dismissed. After he was released from jail before the first transaction, Knowles called Detective Loucks and told him he wanted to help himself.

Prior to the actual transactions, Knowles was not wired with any recording device when talking to the defendant. Knowles acknowledged that Detective Loucks told him that the target of the investigation was the defendant and to contact him when he had a deal arranged with the defendant.

Special Agent Mark Shafer with the Federal Bureau of Investigation, "FBI," testified that in the Spring of 2008, he was assigned to the Violent Crimes and Gangs Task Force and was involved in an investigation of the defendant. On March 21, 2008, Agent Shafer was working with Detective Mark Anderson of the Metropolitan Nashville Police Department in a surveillance van parked inside the Edgehill housing development. The surveillance "was all part of Detective Loucks' case." After they had been parked for some time, the confidential informant arrived, and Agent Shafer observed the informant converse with the defendant. A few minutes later, a white SUV arrived, and the defendant "walk [ed] over to the passenger side of that SUV. He had money in his hand. He handed money to the occupants of the SUV and, in turn, received a handful sized bag." The defendant then gave the bag to the confidential informant.

On cross-examination, Agent Shafer testified that he never met the confidential informant. He did not participate in locating Knowles in December 2008 or afterwards. He would have helped find Knowles if Detective Loucks had asked for his assistance.

Isaac Martinez, with the Metropolitan Nashville Police Department Property Room and Evidence Division, described the procedures for receiving evidence and transporting it to the TBI lab for analysis if requested. Martinez identified the bags of pills submitted by Detective Loucks and described how he transported them to the TBI lab for analysis in April 2008. He said that all of the bags were sealed when he left them with the TBI.

Martinez testified that one of the bags of pills was later taken to the TBI lab a second time, on October 8, 2008, by Sandra Luther who did not work in the property and evidence room. On redirect examination, Martinez noted that another bag of drugs was taken back to the TBI in October 2008 by Luther. He explained that it was not unusual for drugs to be resubmitted to the TBI for analysis, nor was it unusual for a detective to take an item to the TBI.

Agent Jennifer Sullivan, a forensic scientist with the TBI, testified as an expert in forensic chemistry that she analyzed the pills submitted as exhibits

three and five in this case. Her analysis of the twenty pills in exhibit three revealed that each of the pills was a Schedule I drug, the majority were "34 methylenedioxymethamphetamine, or MDMA, commonly known as Ecstasy and methamphetamine" and some were benzylpiperazine and methamphetamine. Agent Sullivan's analysis of the 100 pills in exhibit five revealed that some were the Schedule I substance "34 MDMA and methamphetamine," and some were the Schedule II substance methamphetamine.

Agent John Scott, Jr., a forensic scientist with the TBI, testified as an expert in the field of forensic chemistry that he analyzed the pills submitted as exhibit seven in this case. His analysis of the 200 pills that were submitted revealed that fifty-four of the pills did not contain any controlled substance, seventy-one of the pills contained the Schedule II controlled substance methamphetamine, and seventy-five of the pills contained the Schedule I controlled substance MDMA and methamphetamine.

Mary Beth Stephens, a GIS analyst for the Metro Planning Department, testified that in October 2008, she went with Detective Loucks, the district attorney, and defense counsel to the "corner of Edgehill and 12th" for the purpose of mapping the locations of the drug transactions in the defendant's case. Stephens took with her a map of the area created from aerial photographs and property line data stored in the Planning Department's database. From 12th and Edgehill, Detective Loucks directed Stephens to three separate locations. She made notations on her map of the locations and used her data to create a larger map that noted the locations of the incidents and the locations of schools within the 1000 feet "buffer zones" around the schools in the area.

Stephens identified incident number one as occurring at 1305 12th Avenue South, which was within 1000 feet of two schools, Carter Lawrence Elementary and the Murrell Special Education School. Incident number two occurred at the edge of the pavement immediately across from the housing development, and incident number three occurred at the edge of the sidewalk that led to the playground for the school. Both incidents two and three occurred within 1000 feet of the same two schools as incident one. On cross-examination, Stephens acknowledged that the incident locations noted on her map were based on locations described to her by Detective Loucks.

**Defendant's Proof**

Walter Fisher testified that he was an in-school suspension instructor at Hillsboro High School and had known the defendant for eight of the ten years he had been teaching. Fisher recalled that during the four years the defendant attended Hillsboro, the defendant never had any type of violation or was sent to in-school suspension for any reason. Fisher described the defendant's character as "impeccable," and he said that the defendant was a "model citizen" and loving toward his family. Fisher recalled the defendant's athletic ability and success on the football team, and he described that the defendant had "always been a leader on those teams[.]" He recalled that the defendant's former head football coach, Ron Aydelott, Councilman Ronnie Greer, and the defendant's minister had testified on the defendant's behalf at an earlier hearing.

Fisher testified that he had never known the defendant to use drugs or heard any rumors of the defendant being involved with selling drugs. Fisher knew that the defendant enrolled in college at Tennessee State University instead of going elsewhere because his father had triple bypass surgery and the defendant did not want to leave him. Fisher was aware of a fight the defendant was involved in during high school. To his understanding, another student was continuously provoking the defendant on the school bus. After they got off the bus, the defendant tried to walk away but hit the other student after continued provocation. The defendant only hit the other student once and then walked away. Fisher said that aside from that one fight, the defendant "was a peacemaker at school."

On cross-examination, Fisher clarified that he had coached basketball and had not been one of the defendant's football coaches. Since the defendant's graduation from high school in 2004, Fisher had seen the defendant once every two months but saw him every day during his attendance at Hillsboro. From his observations of the defendant during his school years, Fisher believed the defendant to be a good student, an intelligent person, and a good problem solver. Fisher never saw a situation where the defendant was intimidated during football games.

Fisher testified that he thought it was "[u]nbelieveable" when he heard the defendant had been arrested for selling drugs. It would surprise him if he heard the defendant on audiotape participating in a drug transaction. Fisher had never known the defendant to carry a weapon, and it would surprise him to learn that the defendant had a prior arrest for carrying a weapon. He acknowledged that there were some things about the defendant that he did not

know about. Fisher thought that the defendant being described as a confirmed leader of the Gangster Disciples was "unbelievable." Nevertheless, Fisher said that none of these revelations changed his opinion of the defendant. He agreed that his impressions of the defendant were from his four years of high school, which ended in 2004. On redirect examination, Fisher agreed that the defendant was the type of person who would do anything for a friend.

Suzanne Frensley testified that she was a teacher at Hillsboro High School and was selected as the 2007 Teacher of the Year for the State of Tennessee. Frensley had known the defendant for seven years, beginning when his mother was the caregiver for her godmother. She said that the defendant was "very generous" with her godmother and spent time watching basketball and hockey games with her. She maintained contact with the defendant after she began teaching at Hillsboro. Frensley described the defendant as "[l]arge and strong with a soft inside and a big heart." She said that he was very close to his parents and sister. She noted that he "took a great interest in the people who live in his neighborhood" and was "supportive of the community." Frensley had come to court three times to testify on the defendant's behalf and would never hesitate to do so.

On cross-examination, Frensley clarified that the defendant was never in one of her classes but described herself as his mentor and role model. Frensley noted that she taught leadership at Hillsboro and was not sure that she would have identified the defendant as a leader. She thought that "his leadership is more on a relationship level, caring about people, his family and friends." She noted that people looked up to him, but "he never stood out and said, I'm the leader, I'm the big man."

Frensley stated that she was not aware of the defendant's reputation for carrying a weapon or heard information of him being a confirmed leader of the Gangster Disciples in Edgehill. Frensley was aware of the allegations in this case and that the transactions were recorded on audiotape, but her knowledge of those incidents, although surprising to her, did not change her opinion of the defendant. Frensley acknowledged that she did not know everything that was going on in the defendant's life.

The defendant testified that he had resided with his mother in the Edgehill housing projects his entire life and attended Hillsboro High School where he was captain of the championship football team. He identified several newspaper articles chronicling his football career and described the interest he

-11-

received from many colleges due to his athletic ability. Once he graduated from high school, the defendant enrolled at Tennessee State University and, while in school, worked first for The Tennessean newspaper and then Coca-Cola. He also applied for a job with the United States Post Office, and he had been scheduled to interview in June 2008. The defendant admitted that, at one point in college, his grades dropped and he was placed on academic probation. However, he received a letter saying that he was welcome to come back to school.

The defendant testified that he knew Detective Loucks prior to his arrest "[f]rom around the neighborhood." He said that Detective Loucks had stopped him on more than one occasion and searched him for weapons or drugs but had never found anything. On these occasions, the detective never said that the defendant had done anything wrong, "but they always come around the neighborhood and say they received calls[.]"

The defendant said that he knew Knowles from "growing up in the neighborhood," even though Knowles was seven or eight years older. He and Knowles "had a personal relationship," and Knowles had "been around the family for quite a while." The defendant acknowledged that Knowles purchased drugs from him. He explained that before the first transaction, Knowles approached him near the basketball court and asked if he "kn[e]w anybody with some pills" because he had someone wanting to buy some from him. The defendant told Knowles that he did not and that he did not "want to get involved with it." However, Knowles kept telling the defendant that he needed to get the money to feed his family and "called [him] several times . . . on a day to day basis, . . . [s]o, eventually, [he] gave in and helped him[.]"

The defendant testified that the day before the first transaction, Knowles called and asked if he could purchase thirty extra pills. The defendant told Knowles that he could get them, and Knowles was supposed to come by that night. "[T]he guy" brought the pills to the defendant, but Knowles did not show up that night. The next day, the defendant was in bed asleep when his sister and Knowles came and woke him up. Knowles asked for only twenty Ecstasy pills, and the defendant gave them to him. Knowles then asked the price for 100 pills, and the defendant "gave him a price on it," which was $650. The defendant explained that he knew the price "[b]ecause in the kind of environment [he] grew up in, you'll know the prices for things."

-12-

The defendant admitted that there was a second transaction in which he sold 100 Ecstasy pills to Knowles for $650. However, the defendant did not have the pills in his possession–"[someone] brought them to [him] and [he] gave them to Terrance Knowles." The defendant admitted that after either the second or third transaction, he told Knowles to count the pills. The defendant said that the man who brought the drugs to him was someone he did not know well but "kn[e]w him well enough." The defendant noted that Knowles had called him various times between the first and second transactions and those calls were not on the audiotapes.

The defendant testified that Knowles also called him after the second transaction. The defendant explained that "[i]n between these deals, I kind of, like, was, still, I didn't want to do it[,]" but Knowles kept talking about his family and how he had helped raise him. He tried to put Knowles off by saying that he would see what he could do, but then Knowles would "eventually pop up on the scene . . . [a]nd that's when [he would] just go ahead and call the individual." The defendant said that he never told Knowles on the phone to come over. After the third transaction, the defendant refused to help Knowles "[b]ecause [he] came to a conclusion that [he] didn't want to participate in it anymore."

The defendant acknowledged that he had twice been arrested for weapons possession. After his first arrest, the defendant obtained his handgun carry permit, which required that he be fingerprinted and not have any felonies on his record. With regard to the school bus assault incident when he was fifteen or sixteen, the defendant explained that the other boy kept picking on him, and they "passed words." As he was getting off the bus, the other boy came at him, so he hit him. The defendant said that he and that boy were now close friends. The defendant denied being the leader of the Gangster Disciples but acknowledged that he had been around gang members.

The defendant testified that prior to the first incident with Knowles, he had never sold drugs to anyone. The defendant explained that when he was arrested in this case, the police searched him and his house and did not find any drugs. However, on a nearby roof, the police found drugs that they believed to be his, which resulted in his being charged.

On cross-examination, the defendant acknowledged that when he was arrested, he never told the police he was just doing a favor for a friend. Prior to receiving his handgun permit, the defendant was convicted of unlawful

possession of a weapon and placed on probation. His permit was revoked before his second arrest for unlawful possession, but he said he did not know it had been revoked or he would not have carried a weapon. As to the fight he was involved in as a juvenile, he said that he was charged for an aggravated assault but believed it was amended to simple assault because he did not have a felony on his record.

The defendant acknowledged that during the first transaction, Knowles asked the price for 100 pills and the defendant told him immediately $650. He further acknowledged that the recordings did not reflect his ever telling Knowles that he did not want to sell the drugs. The defendant admitted that the recording from the second transaction reflected him describing the different names for the various colored Ecstasy pills and specifically that Knowles needed to be careful with the "brown bulls" because "[p]eople could pass out on them[.]" The defendant explained that he "was telling [Knowles] what the guy told [him]." The defendant acknowledged that the recording of the third transaction reflects him telling Knowles to count the pills even though the man who delivered them was "usually good."

After the conclusion of the proof, the jury found the defendant not guilty of count 1, the March 4 sale, and guilty of the remaining four counts.

Id. at *1-10.

**Post-Conviction Hearing.** At the May 18, 2012 post-conviction hearing, the Petitioner called trial counsel to testify but did not testify in his own behalf.

Trial counsel testified that she represented the Petitioner and obtained a hung jury in the Petitioner's first trial. She said that at the time she was appointed to represent the Petitioner, she had been practicing law for over two years. She stated that the Petitioner's case involved a confidential informant and that for the two drug transactions of which the Petitioner was convicted, a third party brought the drugs to the scene, and the Petitioner acted as "the go between." In each of these two transactions, the Petitioner took money from the confidential informant and brought the money to a third party before returning and giving the drugs to the confidential informant. She stated that there was no evidence that the Petitioner received any proceeds from the drug sales.

Trial counsel acknowledged that she did not request an instruction on facilitation. She said she did not know why she did not request the facilitation instruction and admitted that she "should have." She added that she was not very familiar with the offense of facilitation

at the time. She also stated that she was "new in the law" at the time of her representation of the Petitioner. Trial counsel said that her failure to request the facilitation instruction was not a strategic decision to argue for acquittal under the entrapment defense or to argue for the lesser included offenses of simple possession or casual exchange. She stated that another attorney assisted her in representing the Petitioner and that she did not discuss the possibility of requesting a facilitation instruction with this other attorney or the Petitioner.

On cross-examination, trial counsel stated that some time between obtaining her law license in 2006 and representing the Petitioner in 2009, she began practicing criminal law exclusively. She said that she had represented other defendants in jury trials prior to representing the Petitioner but was unable to state exactly how many defendants she had represented in jury trials. Trial counsel acknowledged that she had been in the courtroom when the State asked the court whether it was going to charge the jury with a facilitation instruction but stated that she was unable to "specifically recall" the State mentioning the facilitation instruction. She said that her defense theory in the Petitioner's case was entrapment. Pursuant to the entrapment theory, the Petitioner admitted that he took part in the sales but claimed that he was enticed to do so. Trial counsel did not recall arguing for simple possession or casual exchange in her closing argument.

At the conclusion of the post-conviction hearing, the court took the matter under advisement. On June 15, 2012, the court entered its order denying post-conviction relief. In it, the court made the following determinations:

> Facilitation is a lesser included offense of the charged offenses under the Burns test, part (c)(1). See State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999). The Court must also determine whether the evidence supports an instruction on facilitation. Facilitation of a felony occurs when a defendant knows that "another intends to commit a specific felony" and "knowingly furnishes substantial assistance" in committing that felony. Tenn. Code Ann. § 39-11-403(a). The Sentencing Commission Comments to section -403 state that application of the facilitation statute is appropriate where an offender participates substantially in a felony but lacks the intent to promote, assist or benefit from the offense. State v. Fleming, 19 S.W.3d 195 (Tenn. 2000). In this case, the evidence showed that the informant would call the defendant, speak with the defendant about the drugs he wanted to purchase. Although the defendant would have someone bring the drugs to the location, there were no other named defendants in this case. It is improbable that in any case a defendant conducting a drug sale will not need to first obtain pills (or other illegal drugs) from someone else. The issue is the intent of the defendant. To convict of facilitation in this case, proof would be required that the petitioner

-15-

knew "that another person intended to commit" the crime of [sale and delivery] of a controlled substance and that the petitioner furnished "substantial assistance" to that person, although the petitioner did not have "the intent to promote or assist in the commission of the crime or to benefit in the proceeds or results of the offense." See T.C.A. § 39-11-403. Although the petitioner may not have had the drugs on him for the deal, it does not follow that he did not have the requisite intent.

The defendant testified that he had people bring him the drugs. He did not testify that he was conducting the sales for those people that delivered the drugs. He attempted to argue that he was just selling these pills to this informant as a favor and alleged entrapment. The proof in this case fails to establish the identity or existence of "another person" who participated in the commission of the crime. It was the petitioner who entered into the drug transaction and who provided the drugs to the informant. See State v. [Devon] Wiggins, [No. W2007-01734-CCA-R3-CD, 2009 WL 1362323] (Tenn. Crim. App. May 15, 2009). Obviously the defendant did more than assist [in] these sales. Therefore, the Court finds the petitioner has failed to prove this allegation by clear and convincing evidence.

Notwithstanding the Court's finding that it was not error to fail to request an instruction on facilitation given the defense proffered by the petitioner, the Court further finds that there was no showing of prejudice. The jury apparently gave weight to the petitioner's defense that he was entrapped by finding him not guilty in count one for the transaction in which the drugs were actually located with the petitioner at the time of the sale but guilty in the later transactions. Therefore, the Court finds the petitioner has not shown prejudice by the failure to instruct on facilitation.

Following entry of this order, the Petitioner filed a timely notice of appeal.

**ANALYSIS**

The Petitioner contends that trial counsel provided ineffective assistance of counsel by failing to request a jury instruction on the lesser included offense of facilitation. He argues that trial counsel's failure to ask for this instruction constituted ineffective assistance of counsel because it deprived him of his constitutional right to present a defense and of his right to a complete charge of the law. The Petitioner's arguments are more specifically outlined below.

-16-

First, the Petitioner contends that trial counsel was deficient for not arguing both entrapment and facilitation at trial. He asserts that he is entitled to have "every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge[.]" State v. Brown, 836 S.W.2d 530, 553 (Tenn. 1992) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). The Petitioner argues that his testimony at trial that Knowles pressured him into the second and third drug sales supports the offense of facilitation more than an entrapment defense. He also argues that even though the defense of entrapment failed, trial counsel should have requested a facilitation instruction because "his reluctance to continue to secure pills for Knowles . . . support[s]" the offense of facilitation because the supplier of the drugs "intended to commit the offense and he provided substantial assistance to [the supplier of the drugs] and Knowles." See T.C.A. § 39-11-403. In support of his argument that counsel was deficient in failing to request the facilitation instruction, the Petitioner asserts that there was no evidence presented at trial that he received or requested money in exchange for his assistance in the drug transactions.

Second, the Petitioner argues that despite this court's conclusion on direct appeal that it was not clear that the Petitioner did not waive the issue of facilitation for tactical reasons, the evidence presented at the post-conviction hearing established that trial counsel's failure to request a facilitation instruction was not a strategic decision. He claims that trial counsel's testimony showed that her failure to request this instruction was based on her own inexperience in the practice of law. Moreover, he argues that trial counsel's testimony established that her failure to request this instruction was not because she was arguing for an acquittal based on the entrapment defense or for the lesser included offense of simple possession.

Third, the Petitioner argues that the post-conviction erred in its factual finding that the evidence "fail[ed] to establish the identity or existence of 'another person' who participated in the commission of the crime" and erred in its legal conclusion that he was not prejudiced by trial counsel's failure to request the facilitation instruction. He claims that the evidence at trial "clearly established the existence of another person" involved in the relevant drug transactions because he, Detective Loucks, and Knowles all testified that he and Knowles had to wait on the person with the pills to arrive, that he never had any pills to sell Knowles, and that after being pressured by Knowles, he had to call another individual for the pills. He also argues that Detective Loucks testified about someone else throwing pills on top of an awning and fleeing the scene. In support of this third party argument, the Petitioner claims that no pills were found on his person or in his home. Regarding the trial court's finding that he was not prejudiced by counsel's failure to request the facilitation instruction, he alleges, without citation to authority, that the court erroneously concluded that where there is proof of the greater offense, a defendant is not prejudiced by the failure to charge a lesser offense, even if that lesser offense is supported by the evidence.

-17-

Fourth, the Petitioner contends that the proof at trial supported a jury instruction for facilitation. Citing State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999), he argues that "the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser[]included offense" and that "[i]n making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser[]included offense without making any judgments on the credibility of such evidence." Then, he argues, "the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser[]included offense." Id. The Petitioner asserts that because the evidence at trial established that a third person provided the drugs in the relevant transactions and that the Petitioner did not benefit from these drug deals, he lacked the requisite intent for the charged offenses and an instruction for facilitation should have been given pursuant to Burns. He also asserts that because the proof supported a facilitation instruction, trial counsel rendered ineffective assistance by failing to request this instruction.

Fifth, the Petitioner argues that State v. Nash, 104 S.W.3d 495 (Tenn. 2003), and State v. Jimmy Jackson, No. M2011-01077-CCA-R3-CD, 2012 WL 5873506 (Tenn. Crim. App. Nov. 21, 2012), support the conclusion that a facilitation instruction would have been required in this case if it had been requested by trial counsel. He argues that pursuant to "the reasoning employed by our Supreme Court in the Nash decision, there was sufficient evidence for a jury to conclude that [the Petitioner] knowingly offered substantial assistance to the unnamed person or persons who delivered the drugs, thus facilitating the sale of the pills." See Nash, 104 S.W.3d at 500 (concluding that the evidence was sufficient to support an instruction and conviction for facilitation of possession of marijuana with the intent to deliver when the evidence showed that at least one of the individuals in the car had recently smoked marijuana based on the odor detected by the officers at the time of the stop, that Nash and Jefferson entered the apartment together for the purpose of obtaining the marijuana, that Nash saw Jefferson's attempt to hide the marijuana from the officers by moving it from the front center console and putting it under the front passenger seat, that Nash, rather than Jefferson, was in physical control of the marijuana because he was the closest to the marijuana at the time of the stop, that Nash was willing to substantially assist Jefferson in the offense of possessing the marijuana with the intent to deliver, even to the extent of claiming that he was responsible for the offense). In addition, the Petitioner argues that because he was serving drugs for someone else, just as the defendant did in Jimmy Jackson, the evidence supported an instruction on facilitation. See Jimmy Jackson, 2012 WL 5873506, at *6 (concluding that the proof supported an instruction on facilitation as a lesser included offense of the charged offenses when the evidence showed that the confidential informant offered to pay the defendant $50 for assisting him in a drug transaction, that the defendant did not have a cellular telephone or any cash other than the buy money on his person at the time of his arrest, and that the defendant, at the time of his arrest, claimed that he was serving the drugs for another individual). He argues that Nash and Jimmy Jackson emphasize a

defendant's "constitutional right to have the jury consider all possible outcomes raised by and supported by the evidence."

The State responds that the Petitioner has failed to establish that trial counsel was deficient in failing to request the facilitation instruction or that this alleged deficiency prejudiced the outcome of the Petitioner's trial. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2012). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn also repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

Here, the Petitioner was convicted of knowingly selling a Schedule I controlled substance within a school zone. See T.C.A. §§ 39-17-417(a), -432. On appeal, the Petitioner contends that trial counsel provided ineffective assistance in failing to request a jury instruction on the lesser included offense of facilitation. Facilitation of a felony is defined as follows:

A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Id. § 39-11-403(a). Tennessee Code Annotated section 39-11-402(2), which outlines the theory of criminal responsibility relevant in this case, states that a person is criminally responsible for a crime committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]"

"The facilitation of the commission of a felony is an offense of the class next below the felony facilitated by the person so charged." Id. § 39-11-403(b). The comments to the facilitation statute provide helpful guidance in understanding the offense of facilitation:

> [S]ection [39-11-403] recognizes a lesser degree of criminal responsibility than that of a party under § 39-11-401. The section states a theory of vicarious responsibility because it applies to a person who facilitates criminal conduct of another by knowingly furnishing substantial assistance to the perpetrator of a felony, but who lacks the intent to promote or assist in, or benefit from, the felony's commission.
>
> A defendant charged as a party may be found guilty of facilitation as a lesser included offense if the defendant's degree of complicity is insufficient to warrant conviction as a party. The lesser punishment is appropriate because the offender, though facilitating the offense, lacked the intent to promote, assist or benefit from the offense.

Id. § 39-11-403, Sentencing Comm'n Comments.

The law is well-settled that facilitation is a lesser included offense to the charged offenses. Burns, 6 S.W.3d at 466-67. The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. Therefore, "a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000) (citing State v. Teel, 793 S.W.2d 236, 249 (Tenn.1990)). Accordingly, trial courts have a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986) (citing Thompson, 519 S.W.2d at 792). Tennessee Code Annotated section 40-18-110 (Supp. 2008), which was in effect at the time of the Petitioner's trial in February 2009, requires all defendants to make a written request regarding the specific lesser included offenses on which a jury instruction is sought:

(a) When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment. <u>However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.</u>

(b) In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any lesser included offense charge.

(c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

(d) Prior to instructing the jury on the law, the trial judge shall give the parties an opportunity to object to the proposed lesser included offense instructions. If the defendant fails to object to a lesser included offense instruction, the inclusion of that lesser included offense instruction may not be presented as a ground for relief either in a motion for a new trial or on appeal. Where the defendant objects to an instruction on a lesser included offense and the judge does not instruct the jury on that offense, the objection shall constitute a waiver of any objection in the motion for a new trial or on appeal concerning the failure to instruct on that lesser included offense. The defendant's objection shall not prevent the district attorney general from requesting lesser included offense instructions or prevent the judge from instructing on lesser included offenses.

(e) When the defendant requests an instruction on a lesser included offense, the judge may condition the instruction on the defendant's consent to an

amendment to the indictment or presentment, with the consent of the district attorney general, so that if there is a conviction for the requested lesser offense the request shall constitute a waiver of any objection in the motion for new trial and on appeal. The defendant may be required to execute a written document actually consenting to the amendment so that there may be a lawful conviction for the lesser offense. If the district attorney general does not consent to the amendment, the defendant may raise the issue of failure to give the requested charge on appeal. The provisions of this subsection (e) shall not be construed as requiring an instruction on a lesser offense.

T.C.A. § 40-18-110 (Supp. 2008); see Burns, 6 S.W.3d at 469. We note that in determining which instructions shall be given, "[t]he trial court must provide an instruction on a lesser[]included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense" because "[t]he evidence, not the theories of the parties, controls whether an instruction is required." State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002).

We have taken judicial notice of the record from the Petitioner's direct appeal. See Calvin Eugene Bryant, Jr., 2010 WL 4324287. At the close of the proof in the Petitioner's case, the court had a discussion with defense counsel and the State regarding the instructions to the jury. The court stated that it was going to instruct the jury on the charged offenses as well as the sale and delivery of a Schedule I controlled substance not within a school zone. Defense counsel asked the court if it had included the defense of entrapment in the instructions, and the trial court replied that it had. The court also stated that it was going to instruct the jury as to simple possession or casual exchange. Although trial counsel initially requested a jury instruction on attempt, she abandoned this request after the court informed her that it was going to instruct on simple possession or casual exchange and questioned whether the evidence supported an instruction on attempt. Then the following exchange occurred in the presence of defense counsel:

[The State]:   Is facilitation in there or no? Just so that we know what [will be charged]. Our position is that it shouldn't be in there, but–

The Court:   No, I didn't have it in there.

Following this exchange, trial counsel stated nothing, and the State moved on to another issue.

On direct appeal, the Petitioner argued that the trial court erred in failing to instruct the jury regarding the lesser included offense of facilitation. However, because the Petitioner

-23-

had waived this issue by failing to request the facilitation instruction during trial and by failing to include this issue in the motion for new trial, the Petitioner asserted that the court's failure to give the instruction was plain error. Calvin Eugene Bryant, Jr., 2010 WL 4324287, at *19. This court, after discussing the law relevant to plain error analysis, concluded that the trial court did not commit plain error by failing to instruct on facilitation:

> We decline to notice plain error because it is not clear that the defendant did not waive the issue for tactical reasons. See State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006) (finding no plain error in court's failure to instruct on facilitation because "[t]he defendant . . . failed to show that he did not waive th[e] issue for tactical reasons"). Here, the record shows that defense counsel was obviously present during the exchange between the State and the court regarding whether facilitation was going to be charged and presumably attentive to the colloquy. In her closing argument, defense counsel used the "facts" that allegedly support an instruction on facilitation–that a third party brought the pills and the defendant did not profit from the transaction– to argue that the defendant was only guilty of simple possession or casual exchange, offenses carrying a much lesser penalty than facilitation of a Class A felony would carry. Given our supreme court's directive that our discretion to notice plain error is to be "sparingly exercised," Bledsoe, 226 S.W.3d at 354, the defendant is not entitled to relief.

Calvin Eugene Bryant, Jr., 2010 WL 4324287, at *20.

While this court previously analyzed this issue based on a plain error analysis, we are charged with determining whether trial counsel's failure to make a written request of the facilitation instruction or to object to the trial court's decision to omit the instruction constituted ineffective assistance of counsel. See Aldrick D. Lillard v. State, No. M2011-01380-CCA-R3-PC, 2012 WL 4479275, at *13 (Tenn. Crim. App. Sept. 27, 2012). Following the evidentiary hearing, the post-conviction court denied post-conviction relief. As we will explain, we conclude that the record supports the post-conviction court's denial of relief in this case.

The record shows that the trial court instructed the jury on the following lesser included offenses for the three counts of sale of a Schedule I controlled substance within a school zone: (1) sale of a Schedule I controlled substance, and (2) simple possession or casual exchange of a controlled substance. In addition, the trial court instructed the jury on the following lesser included offenses for the two counts of delivery of a Schedule I controlled substance within a school zone: (1) delivery of a Schedule I controlled substance, and (2) simple possession or casual exchange of a controlled substance.

-24-

In determining whether trial counsel provided ineffective assistance of counsel, we are guided by this court's opinion on direct appeal, which noted that defense counsel used the "'facts' that allegedly support[ed] an instruction on facilitation–that a third party brought the pills and the defendant did not profit from the transaction–to argue that the defendant was only guilty of simple possession or casual exchange, offenses carrying a much lesser penalty than facilitation of a Class A felony would carry." At first glance, one might argue that trial counsel's failure to request an instruction on facilitation, given the involvement of a third party who supplied the drugs, was deficient because it fell below the range of competence demanded of attorneys in criminal cases. However, a more thorough review of the trial transcript shows that trial counsel's failure to request this instruction was a strategic decision to have the Petitioner acquitted of the charged offenses based on the defense of entrapment or found guilty of the significantly lesser included offenses of simple possession or casual exchange, Class A misdemeanors, rather being found guilty of the offenses of facilitation of the sale and delivery of a Schedule I controlled substance within a school zone, Class B felonies. A review of the trial transcript shows that trial counsel devoted an enormous amount of her case-in-chief to convincing the jury that the Petitioner was a respected member of the community who never would have assisted Knowles in obtaining drugs unless Knowles had induced him into doing so based on Knowles's false claim that he needed the drugs to support his family. Given the defense's proof and theory at trial, it was clear that trial counsel's goal was to have the Petitioner acquitted of the charged offenses, or, at worst, convicted only of the misdemeanor offenses of simple possession or casual exchange; therefore, we conclude that trial counsel's failing to request the facilitation instruction was not deficient performance.

We also conclude, after fully evaluating the record on direct appeal, that a facilitation instruction was wholly inconsistent with the trial counsel's theory of entrapment. It would have been extremely difficult, if not impossible, for trial counsel to fully commit to the theory that Knowles induced the Petitioner into assisting him in obtaining drugs for the purpose of supporting his family and then also argue that if the jury refused to accredit the defense's proof regarding the Petitioner's impeccable character and his unwillingness to assist Knowles, then they should convict him of the serious offense of facilitation of the sale of a Schedule I controlled substance within a school zone, a Class B felony. Because trial counsel's goal was to have the Petitioner emerge from the trial relatively unscathed, it would have undermined this goal for trial counsel to also argue that the Petitioner was guilty of the offense of facilitation to the jury. Trial counsel's unwillingness to undermine her defense theory is further supported by her abandonment of her request that the trial court instruct the jury on the lesser included offense of attempt. Despite trial counsel's admission at the post-conviction hearing that she did not make a strategic decision not to request the instruction on facilitation, we conclude that, in light of her defense theory and the evidence presented

in her case-in-chief, trial counsel's decision not to pursue a facilitation instruction was a strategic one, and therefore, not deficient performance.

Finally, the record supports the post-conviction's determination that the Petitioner failed to establish that trial counsel's performance was deficient because the evidence does not support a facilitation instruction. In its written order, the court noted that although facilitation is a lesser included offense of the charged offenses, it was required to instruct on a lesser included offense only if the evidence supported that offense. See Allen, 69 S.W.3d at 188. It emphasized that whether the proof supported a facilitation instruction depended on the Petitioner's intent at the time of the offenses. The court said that the Petitioner did not have the requisite intent for facilitation in light of the evidence presented at trial, which showed that the Petitioner "did more than assist [in] these [drug] sales" because he "entered into the drug transaction and . . . provided the drugs to the informant[.]" The court found that although the Petitioner testified that he obtained the drugs from a third party to sell to the confidential informant, he did not testify that he substantially assisted the third party in the offense but lacked the intent to promote, assist, or benefit from the offense. We also agree that the fact the Petitioner obtained drugs from a third party does not require a facilitation instruction unless there is evidence that the Petitioner, though facilitating the offense, lacked the intent to promote, assist, or benefit from the offense. The court ultimately held that the trial counsel was not deficient in failing to request an instruction on facilitation in light of the evidence at trial and the defense of entrapment. As we will explain, the evidence at trial established that the Petitioner had the intent, at a minimum, to promote or assist in the commission of the sale of a Schedule I controlled substance within a school zone. For this reason, we also conclude that trial counsel's decision not to pursue a facilitation instruction was not deficient.

In the event of further review by the Tennessee Supreme Court, we must also determine whether the Petitioner was prejudiced by trial counsel's failure to request the instruction on facilitation. This question hinges on whether the failure to instruct the jury regarding facilitation as a lesser included offense is harmless beyond a reasonable doubt. See Robert Gentry Galbreath v. State, No. M2003-02807-CCA-R3-PC, 2005 WL 119534, at *16 (Tenn. Crim. App. Jan. 19, 2005). If the error is harmless, then trial counsel's failure to request the facilitation instruction did not prejudice the Petitioner. Id. We note that "'when determining whether an erroneous failure to instruct on a lesser-included offense requires reversal, . . . the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt.'" State v. Davis, 266 S.W.3d 896, 903 (Tenn. 2008) (quoting Ely, 48 S.W.3d 710, 727 (Tenn. 2001)).

This court has recognized two approaches for deciding whether a trial court's failure to charge a lesser included offense is harmless error, and these two approaches guide us in

determining whether the Petitioner was prejudiced by trial counsel's failure to request a lesser included offense. The first approach, which is inapplicable to this case, states that a Petitioner would be unable to prove that he was prejudiced by trial counsel's failure to request a lesser included offense if the jury considered and rejected an "intermediate" or "buffer" offense between the offense the Petitioner argues should have been charged and the charge of which he was convicted:

> The first approach is implicated where the trial court instructs the jury as to the charged offense as well as other lesser-included offenses thereof but does not instruct the jury regarding all of the lesser-included offenses supported by the evidence. When the jury convicts the defendant of the greater charged offense rather than the lesser-included offense or offenses, the jury necessarily rejects all of the other lesser offenses. State v. Locke, 90 S.W.3d at 672; State v. Allen, 69 S.W.3d at 191; State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). Where one of the charged but rejected lesser-included offenses is an intermediate or buffer offense standing between the errantly omitted lesser-included offense and the offense for which the defendant was convicted, the charging error is shown to be harmless beyond a reasonable doubt. State v. Locke, 90 S.W.3d at 675; State v. Allen, 69 S.W.3d at 190.

State v. Banks, 271 S.W.3d 90, 126 (Tenn. 2008); accord Allen, 69 S.W.3d at 189; State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998); Larry Payne v. State, No. W2011-01080-CCA-R3-PC, 2013 WL 501781, at *5 (Tenn. Crim. App. Feb. 8, 2013); Ydale Banks v. State, No. W2010-01610-CCA-R3-PC, 2012 WL 1067201, at *13 (Tenn. Crim. App. Mar. 27, 2012), perm. app. denied (Tenn. Sept. 18, 2012). Because we do not consider the sale or delivery of a Schedule I controlled substance outside a school zone as an intermediate or "buffer" offense, this approach is not applicable in this case.

The second approach, which is applicable to this case, "requires the reviewing court to consider the evidence and then to decide 'whether a reasonable jury would have convicted the defendant of the lesser[]included offense instead of the charged offense.'" Banks, 271 S.W.3d at 126 (quoting State v. Richmond, 90 S.W.3d 648, 662 (Tenn. 2002)). Under this view, the failure of a court to charge the lesser included offense is harmless beyond a reasonable doubt if "[i]f no reasonable jury would have convicted the defendant of the uncharged lesser[]included offense rather than the offense for which the defendant was convicted." Id. (citing State v. Locke, 90 S.W.3d 663, 675 (Tenn. 2002)).

This court has recognized a strict interpretation of this second approach, which concludes that "the failure to charge a lesser-included offense can never constitute reversible error in a criminal case if the defendant has been found guilty of the greater offense." Larry

Payne, 2013 WL 501781, at *4. Pursuant to this view, a defendant's conviction on a greater offense is incontrovertible proof that the trial court's failure to charge the lesser included offense was harmless error:

> According to the strict view, juries are presumed to follow the instructions of the trial court. See State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001). In accordance with the supreme court's holding in State v. Davis, 266 S.W.3d 896, 910 (Tenn. 2008), trial courts are mandated to "instruct the jury to consider the offenses in order from greatest to least within each count" and further instruct them that they "shall not proceed to consider any lesser-included offense until [the jury] has made first a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense." Id. at 910. Under this view, even if the jury had been charged with the lesser-included offense, it was prohibited from considering such until after it acquitted the defendant of the greater charge. A defendant's conviction of the greater charge is thus irrefutable proof that a trial court's failure to instruct on a lesser-included offense was harmless error. By the same reasoning, in post[-]conviction, a petitioner can never show that his trial counsel's failure to request a lesser included offense was prejudicial; the jury's conviction of the greater charge prohibited any consideration of a lesser charge, and consequently as a matter of law there was no possibility whatsoever–much less a reasonable probability–that but for counsel's failure to request the lesser-included offense the result of the proceeding would have been different.

Id.; accord State v. Nathaniel Shelbourne, No. W2011-02372-CCA-R3-CD, 2012 WL 6726520, at *12 (Tenn. Crim. App. Dec. 26, 2012) (Woodall, J., concurring) (concluding that even if the lesser included offense had been charged, "the jury was prohibited from considering it because the jury convicted Defendant of the charged offense . . . , never acquitted Defendant of that charged offense, and thus could never consider the lesser included offense . . . even if it had been charged").

In applying this second approach, we must consider the evidence and then determine whether a reasonable jury would have convicted the Petitioner of the lesser included offense of facilitation. The evidence presented at trial showed that the Petitioner agreed to sell one hundred Ecstasy and methamphetamine pills to Knowles on March 21, 2008, and agreed to sell two hundred Ecstasy and methamphetamine pills to Knowles on April 23, 2008. In each of these drug transactions, the Petitioner immediately informed Knowles as to the purchase price of these drugs, directly contacted the supplier of the pills, and gained possession of the requested pills within a short time frame. The audiotape of the March 21, 2008 drug

transaction shows that the Petitioner willingly orchestrated the drug sales for Knowles, made several phone calls to the supplier to confirm the arrival time, described the types of pills that would be involved in the transaction, warned Knowles of the side effects of one type of pill, and informed Knowles that he was going take Knowles's money and obtain the pills from the supplier. The tape from the April 23, 2008 transaction shows that the Petitioner told Knowles that the supplier should be there in ten to fifteen minutes, that the Petitioner asked Knowles how much money he had for the pills, and that the Petitioner told Knowles to count the pills, even though his supplier was "usually good[.]" In addition to these audiotapes of the drug transactions, Detective Loucks testified at trial that the Petitioner told him that he usually sold "thirty to forty" pills a week. Although the Petitioner claimed that Knowles enticed him into obtaining the pills by saying that he needed the money from the pills to take care of his family, the jury rejected this entrapment defense. In addition, although the Petitioner claimed that he knew the price for certain quantities of drugs because of the environment in which he lived, the jury rejected this claim by convicting him of the charged offenses in counts two through five. Upon review, we conclude that a reasonable jury would not have convicted the defendant of facilitation instead of the charged offenses because the Petitioner knowingly committed the offense of sale of a Schedule I controlled substance and because this sale took place within a school zone. Cf. Galbreath, 2005 WL 119534, at *16 (concluding that trial counsel's failure to request an instruction on facilitation of obtaining a prescription drug by fraud was not harmless beyond a reasonable doubt where some of the evidence showed that the Petitioner was picking up the prescription for a friend identified as "Terry Sanders," that this friend drove the Petitioner to the pharmacy, and that this friend fled the pharmacy when the Petitioner was arrested). Moreover, we agree with the State's assertion that "[a]lthough the petitioner argues broadly that incurring convictions for facilitation was 'one of the possible outcomes had counsel requested a facilitation instruction, he has not shown that but for counsel's decision not to request the instruction, a reasonable probability of that outcome exists.'" Accordingly, trial counsel's failure to request the facilitation instruction was not prejudicial.

We also conclude that the Petitioner failed to establish that he was prejudiced by trial counsel's alleged deficiency pursuant to the strict interpretation of this second approach, which focuses on "acquittal-first" jury instructions. Here, the jury was instructed on the sale and delivery of a Schedule I controlled substance within a school zone, the sale and delivery of Schedule I controlled substance, and simple possession or casual exchange, and the jury convicted the Petitioner of the charged offenses in all but count one, where the jury acquitted the Petitioner of the charged offense and all of the charged lesser included offenses. Even if trial counsel had successfully requested that the jury receive instructions on facilitation, the jury was precluded from considering the facilitation offense because it convicted the Petitioner of the charged offenses, Class A felonies, in counts two through five. Therefore, the Petitioner is unable to prove prejudice because he failed to establish a reasonable

probability that, but for counsel's alleged deficiency regarding the facilitation instruction, the result of his trial would have been different.

The record supports the post-conviction court's determination that trial counsel did not provide ineffective assistance by failing to request the facilitation instruction at trial. The Petitioner has failed to establish his claim of ineffective assistance of counsel by clear and convincing evidence and, therefore, is not entitled to relief.

## CONCLUSION

We conclude that the Petitioner failed to meet his burden of showing that he was denied effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE